UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ALESIA HURBAN,

                    Plaintiff,

          vs.                                          3:16-cv-552 (NAM/DEP)

UNITED HEALTH SERVICES HOSPITALS, INC.,

                    Defendant.
_____

APPEARANCES:

Zachary Holzberg, Esq.
DEREK SMITH LAW GROUP, PLLC
30 Broad Street, 35th Floor
New York, New York 10004
*Attorneys for Plaintiff*

Dawn J. Lanouette, Esq.
HINMAN, HOWARD & KATTELL, LLP
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13902-5250
*Attorneys for Defendant*

Hon. Norman A. Mordue, Senior U.S. District Judge:

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Plaintiff Alesia Hurban brings this action alleging violations of her rights while she was

employed by Defendant United Health Services Hospitals, Inc. ("UHS").  (Dkt. No. 1).

Plaintiff asserts discrimination and retaliation claims under the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101–12213, as well as related violations of New York state law.

(*Id.*).  Now pending before the Court is Defendant's motion for summary judgment.  (Dkt. No.

46).  Plaintiff opposes the motion.[1]  (Dkt. Nos. 68, 69, 83).  For the reasons stated below, the motion is granted.

## II.    BACKGROUND[2]

### A.  Plaintiff's Employment

Plaintiff was hired by UHS as a Registered Nurse ("RN") in September 2013.  (Dkt. No. 46-55, ¶ 1).  Plaintiff was assigned to work primarily at the UHS Vestal Walk-in facility (the "Walk-in"), where she typically worked twelve hour shifts, three days per week.  (*Id.*, ¶¶ 2–4).  From September until December 2013, Plaintiff's Unit Coordinator ("UC"), or supervisor, was Sarah Horton, and from December 2013 to December 2014, Plaintiff's UC was Matt Masse.  (*Id.*, ¶¶ 10–11).  From December 2014 until her termination in September 2015, Plaintiff's UC was Louise Clark.  (*Id.*, ¶ 12).  The UC reported to the Manager, and Kathleen Lange was the Manager during Plaintiff's employment.  (*Id.*, ¶¶ 13–14).  Plaintiff also had a clinical supervisor, Bridget Talbut.  (*Id.*, ¶ 15).  Patients at the Walk-in did not have appointments; when a patient arrived, they were typically put in a queue and seen in the order in which they arrived.  (*Id.*, ¶¶ 16–17).  In some cases, a patient with more serious symptoms was assessed (triaged) and was either seen earlier or was sent to the emergency room.  (*Id.*, ¶ 18).

---

[1] Plaintiff's opposition to Defendant's motion argued in part that summary judgment should be denied as premature since discovery at that time was not yet complete, and that Plaintiff required additional discovery to oppose Defendant's motion under Fed. R. Civ. P. 56(d).  After Plaintiff filed her opposition, the parties completed discovery, and therefore, the Court granted Plaintiff leave to file a supplemental memorandum of law addressing any additional evidence pertinent to Defendant's summary judgment motion.  (*See* Dkt. Nos. 80, 83).  The Court also granted Defendant leave to respond.  (Dkt. Nos. 84–86).

[2] The facts stated herein are drawn from the parties' submissions, including their Statements of Material Facts and Responses, as well as exhibits that the parties have submitted, to the extent that they are admissible as evidence.  Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party, the Court has found such facts to be true.  *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

### B. Breast Cancer Treatment

In 2013, Plaintiff asked her supervisor Horton for permission to schedule a breast cancer biopsy during her shift. (Dkt. No. 46-55, ¶ 34). Plaintiff testified that she was "told to reschedule it because it wasn't convenient for the walk-in." (Dkt. No. 46-3, p. 16). Plaintiff was able to reschedule the biopsy. (Dkt. No. 46-55, ¶ 36). Plaintiff's initial appointment with the UHS breast surgery center was on September 30, 2013. (*Id.*, ¶ 38). Plaintiff had imaging done on November 4, 2013, and the biopsy occurred on November 12, 2013. (*Id.*, ¶¶ 39–40). Following the biopsy, Plaintiff reported for work at the Walk-in. (*Id.*, ¶ 41). Plaintiff testified that she "felt compelled to report to work an hour after my biopsy was done." (Dkt. No. 46-3, p. 18). Plaintiff testified that she did not ask for time off but told Horton "what was recommended," and Horton "made a point of telling me that I would be shorting the walk-in." (*Id.*, p. 21). While back at work, Plaintiff pulled out her sutures lifting a child, but she did not report the injury. (Dkt. No. 46-55, ¶¶ 44–46).

In 2014, Plaintiff asked for time off to attend a consultation for her breast cancer and her supervisor at the time, Masse, agreed. (Dkt. No. 46-55, ¶ 22). In August of 2014, Plaintiff was hospitalized due to "an interaction with my chemotherapy medication and an additional medication." (Dkt. No. 46-3, p. 75). Plaintiff was not eligible for leave under the Family Medical Leave Act ("FMLA") at the time as she had not been employed at UHS for at least one year; instead she requested and received approval from Masse for a personal leave of absence. (Dkt. No. 46-55, ¶ 26). Plaintiff testified that she contracted chicken pox at the hospital and had to be cleared by occupational medicine before returning to work. (Dkt. No. 46-3, pp. 75–76). Plaintiff testified that she did not have any problem taking this leave of absence. (*Id.*, p. 76).

Plaintiff testified that she later requested and received FMLA leave related to surgery for her breast cancer. (Dkt. No. 46-3, p. 78). Her surgery was scheduled for November 4, 2014. (*Id.*). Plaintiff underwent a double mastectomy and was out of work until February 2, 2015. (*Id.*, p. 86; Dkt. No. 46-55, ¶ 30). Plaintiff returned to work with restrictions on days and hours, and her restrictions were accommodated. (Dkt. No. 46-55, ¶ 31). Plaintiff had no problem taking the leave for surgery or with her restrictions being accommodated when she returned. (*Id.*, ¶ 32).

### C. June 21, 2014 Meeting

On June 21, 2014, Plaintiff met with her supervisor Masse and Lange, the Walk-in Manager, to discuss various concerns. (Dkt. No. 46-3, p. 47). Plaintiff told them that she was concerned about staffing because a nurse was leaving. (*Id.*, pp. 47–48). Plaintiff sought assurances the position would be filled, but Masse and Lange could make no guarantee. (*Id.*, p. 48). Plaintiff also complained about the consistency of staffing and morale at the Walk-in. (*Id.*, pp. 48–49). Plaintiff testified that she did not believe that her concerns were taken seriously. (*Id.*, pp. 51–52). At the meeting, Plaintiff did not complain about discrimination or a failure to accommodate a disability. (*Id.*, pp. 53–54). After the meeting, Lange contacted Talbut, Plaintiff's clinical supervisor, to make her aware of what had occurred. (Dkt. No. 46-55, ¶ 172). Prior to receiving the phone call from Lange, Talbut had already counseled Plaintiff about her communication with supervisors. (*Id.*, ¶ 173).

### D. Clinical Ladders Application

In 2014, Plaintiff applied to the Clinical Ladders program, which encourages nursing leadership at UHS. (Dkt. No. 46-55, ¶¶ 174–75). After talking to Lange about the June 21, 2014 meeting, Talbut consulted with Candy Contento, the Clinical Ladders program

administrator about Plaintiff's application. (*Id.*, ¶ 176). Contento advised that Talbut could pull the application, let it go through, or place a hold on it for three months. (*Id.*, ¶ 177). Talbut decided to hold it and then asked Plaintiff to meet to discuss her application. (*Id.*, ¶¶ 178–79). Plaintiff testified that she was told at the meeting that her application was being held "because they felt maybe I needed to work on my communication skills." (Dkt. No. 46-3, p. 61).

During this time, Talbut arranged for Plaintiff to meet with Masse and Lange regularly. (Dkt. No. 46-55, ¶ 181). Plaintiff had one meeting with Masse and Lange. (*Id.*, ¶ 182). Plaintiff testified that she "agreed to a meeting . . . and then decided to pull my application at that point." (Dkt. No. 46-3, p. 61). Talbut emailed Plaintiff and asked her to meet to discuss future opportunities. (Dkt. No. 46-55, ¶ 184). Contento also emailed Plaintiff to advise her that she could reapply to the Clinical Ladders program in the future. (*Id.*, ¶ 186). Plaintiff wrote to Contento and declined to reapply. (*Id.*, ¶ 187).

### E.  Complaint to UHS CEO Matt Salanger

On June 25, 2014, Plaintiff emailed the CEO of UHS, Matt Salanger, about some of the concerns she had raised at the June 21, 2014 meeting. (Dkt. No. 46-11). In the email, she also complained about her interactions with Lange. (*Id.*). She did not complain of discrimination and did not discuss patient safety. (*Id.*). Salanger spoke to Plaintiff on the telephone and referred her complaint to the Ombudsman for UHS. (Dkt. No. 46-55, ¶ 193). Plaintiff testified that the Ombudsman looked into the matter and told her that Lange "did admit that she could have handled the situation better with me in terms of her tone or harshness, and that was it." (Dkt. No. 46-3, p. 73). Plaintiff was dissatisfied because she felt the outcome should have included Lange apologizing to her. (Dkt. No. 46-55, ¶ 195).

### F. Complaints Regarding Patient Safety

Plaintiff spoke to Lange on several occasions when a patient came to the Walk-in with an injury that should have been seen in the ER. (Dkt. No. 46-55, ¶ 139). UHS took a number of steps to address her concern, which included: taping a "Docs on Call" segment for TV and the UHS website, holding meetings with providers on what was appropriate to refer to the Walk-in, and preparing education material for patients. (*Id.*, ¶ 140). In some cases, Lange would advise the Medical Director when a provider made an inappropriate referral. (*Id.*, ¶ 141).

Plaintiff also complained to Lange that the trained staff who float between UHS's three Walk-ins ("float staff") did not have keys to access items in Vestal and were unfamiliar with the Vestal Walk-in. (Dkt. No. 46-55, ¶¶ 142–43). Lange responded that the float staff would have to be directed where to go and regular staff could unlock things. (*Id.*, ¶ 146). Talbut worked with the nurses to develop orientation material for float staff. (*Id.*, ¶ 147). There was no incident where float staff could not get to items that were needed. (*Id.*, ¶ 148).

Plaintiff also complained that the door between the patient waiting area and the clinical area was not locked. (Dkt. No. 46-55, ¶ 149). Locking the door was a problem because of ambulance staff. (*Id.*, ¶ 150). But security was always present when the building was open. (*Id.*, ¶ 151). In response to the complaint, Lange requested a security audit of the building and sought an estimate for a badge system. (*Id.*, ¶ 152). Lange also arranged for training for the staff in de-escalating upset patients and tense situations. (*Id.*, ¶ 153).

### G. 2015 Holiday Schedule

In 2013, Plaintiff worked the following hours on holidays: 8.5 Hours on Thanksgiving, 12 hours on Black Friday, 9.25 hours on Christmas Eve, 12 hours on Christmas, 0 hours on New Year's Eve, and 7.75 hours on New Year's Day. (Dkt. No. 46-55, ¶ 50). In 2014, Plaintiff did

not work on any holidays because she was on leave during that time due to her breast cancer treatment. (Dkt. No. 46-3, p. 85). On July 30, 2015, Plaintiff's supervisor Clark sent an email to all Walk-in staff listing employees who had been off on the holidays the year before and who should expect to be available to work the 2015 holidays. (Dkt. No. 46-18, pp. 2–4). Plaintiff was listed for five days since she did not work any holidays in 2014. (Dkt. No. 46-55, ¶ 58). Two other individuals, Michelle F. and Sarah G., were listed for five days as well. (Dkt. No. 46-18, pp. 2–4). The email states in relevant part that "[t]hese are assignments based on what holidays you did or did not work last year. This does not include anyone who may volunteer to work the holidays; there will be an opportunity to make trades as we get closer and the actual schedule comes out." (*Id.*, p. 4).

According to Clark, the purpose of the email was to "[t]o let staff know the holidays that they may have to work in the upcoming holidays." (Dkt. No. 46-31, p. 6). Clark further testified that the schedule was determined "based on whether or not they worked it the previous year." (*Id.*). Plaintiff testified that she believed the email was sent to staff to inform them what holidays they would be working or should expect to be working in 2015. (Dkt. No. 46-3, p. 83). Plaintiff testified that she was not told the schedule was "final," but "they made sure that I was aware that – the fact that there was a chance that I was going to be working every holiday and that my cancer didn't matter and I was going to do as I was told." (*Id.*, p. 87).

On July 30, 2015, Plaintiff responded to the email and asked if there was "any consideration for the fact that I was out for cancer surgery and that's why I didn't work?" (Dkt. No. 46-18, p. 2). Plaintiff then sent a second email indicating which dates and times she would prefer not to work. (Dkt. No. 46-19, pp. 2–7). On August 11, 2015, Lange emailed Plaintiff, stating in relevant part that "you can make arrangement[s] to trade for coverage within your job

6

classification. However, if coverage arrangements cannot be made, you are expected to work all of the hours you are scheduled for." (Dkt. No. 46-19, p. 2). Plaintiff complained to another nurse, Kathy Nichols about the holiday schedule, and Nichols offered to work Christmas Eve evening for Plaintiff if she was scheduled for that time. (Dkt. No. 46-55, ¶¶ 66–67). Ultimately, Plaintiff emailed Clark on August 13, 2015, stating that "I have removed any requests for holiday time. Like I said I will work all as indicated." (Dkt. No. 46-20, p. 2). Clark responded that she appreciated Plaintiff's flexibility and would do what she could to honor Plaintiff's requested schedule. (*Id.*).

### H. Emails with Dan Westgate

On August 11, 2015, Plaintiff emailed Dan Westgate, the Director of Employee Relations for UHS, stating in relevant part:

> The issue of working holidays has come up recently. My first year here (2013), I was told by my Unit Coordinator, Sarah Horton, I was to work every holiday and often the day before and after as well and I did it without question. Last year, I was out for a double mastectomy during the holidays, the date of which was planned based around when my chemo had to be discontinued. I spent the holidays in pain unable to use my arms and needless to say no real celebrating other than my surgery was curative. When we got a notice for who was "due" to work this year, I was listed on every holiday and eve because I was out last year with my surgery. I asked if there was any consideration for the fact that I was out for catastrophic illness and was told by Kathleen Lange no – it didn't make a difference. If you were told to work unless you found your own coverage to work, you were expected to work . . . . . so it looks like I will be working all the holidays again this year if I can't make other arrangements. I don't know who write[s] these policies but in an industry where we are asked to show caring and compassion, there was none shown to me. There was not even an "I'm sorry you had to go through that." It was just a cold this is the policy . . . . period. I will work as expected this year and will celebrate with my family on other days but whomever writes these policies, I hope would consider adding a caveat for these types of situations for others like me in the future.

(Dkt. No. 46-21, pp. 2–3). Westgate responded and asked Plaintiff if there was a particular day or time she wanted off. (*Id.*, p. 2). Plaintiff wrote back that the only time she wanted off was

the evening of Christmas Eve.  (*Id.*).  On August 30, 2015, Plaintiff emailed Westgate again, writing that: "I did not hear back from you regarding the issue of making someone work every holiday if they were out the year before due to catastrophic illness (cancer surgery). Also, can you please send any policies that address this issue?"  (Dkt. No. 46-22, p. 3).

According to Westgate, he investigated the matter by talking to Plaintiff's supervisors and determined that Plaintiff was "being treated the same as all employees who did not work the particular days at issue, regardless of the reason they did not work them."  (Dkt. No. 46-48, ¶¶ 19–20).  On September 1, 2015, Westgate wrote back to Plaintiff, stating in relevant part:

> Ultimately the decision is up your management team.  I have been speaking with them over the past number of weeks regarding this, it sounds like they are trying to be "fair" about ensuring that all employees have a chance to be off during key holiday periods.  While we certainly are sorry for the circumstances you were dealing with last year, others did cover for the time that you were away. Therefore management is trying to ensure that other staff have an opportunity to take time this year.  I understand that both Louise and Kathleen have said that if you wanted Christmas Eve off (either the whole day or 4 hours in the evening – which is what you indicated to me you were most concerned about) you could check with your co-workers to see if they could cover that time.  The same would be true for other days/holidays that you may be scheduled for.  As far as policy is concerned, you can go on the UHS Intranet, under policies, then under Human Resources – you are looking for Human Resource Policy 4.1 "Paid Time Off". The specific paragraph you are looking for is Section IV "Scheduled PTO, part "A."

(Dkt. No. 46-22, p. 2).  Plaintiff responded to Westgate with the following message:

> I read the policy and it indicated where you directed me that cases of highly desirable periods (Christmas week, etc.) "rotation of those periods among staff should be practiced."  It also stated that employees should try to work it out however, supervisor intervention to ensure reasonableness is encouraged and scheduled [sic] without consideration of an individual needs is NOT condoned. My first year here, 2013, I was told I had to work EVERY holiday and eve and often the day after as well without discussion or argument by Sarah Horton.  If you want to go look at my attendance file you can see all the holiday time I spent working.  I essentially covered so other employees had off with NO consideration of my holiday time with family.  And I still contend that the circumstances of my absence last year should have some carry some measure of compassion when looking at this year.  I spent last Christmas season in painful recovery – no family

> get together's, etc.  Scheduling me for every holiday during the Christmas season certainly does not take into consideration my individuals needs which per the policy is <u>not condoned</u> and it's starting to make me feel like I'm being discriminated against for having breast cancer and having needed surgery (which in my case was life saving!).

(*Id.*).

According to Westgate, he "did not realize at the time that Ms. Hurban had responded back to me," and only later found her email after the September 2, 2015 meeting with Plaintiff. (Dkt. No. 46-48, ¶ 27; *see also* Dkt. No. 83-2, pp. 89–90).  Westgate also avers that he did not forward Plaintiff's email to Lange or Talbut or share its contents with them.  (Dkt. No. 46-48, ¶ 28; Dkt. No. 83-2, p. 91).  Westgate states that "[t]he email did not play any role in Ms. Hurban's termination."  (Dkt. No. 46-48, ¶ 27; Dkt. No. 83-2, p. 91).  Plaintiff never received a finalized holiday schedule as she was terminated before the holiday schedules were issued. (Dkt. No. 46-55, ¶ 69).

### I.  Infection Control Policy Incident

In August 2015, Plaintiff received a written warning for violating the Infection Control Policy by eating a bagel while working at the Walk-in.  (Dkt. No. 46-55, ¶ 70).  Plaintiff was aware of the Infection Control Policy and had training on it prior to the write up.  (*Id.*, ¶ 71). Plaintiff signed a constructive discipline form and took responsibility for her actions.  (*Id.*, ¶ 73).  The form is dated August 11, 2015.  (Dkt. No. 46-24).  Plaintiff received the constructive discipline form in a meeting with Lange and Clark.  (Dkt. No. 46-55, ¶ 75).  Lange had written up several other employees for violation of the Infection Control Policy.  (*Id.*, ¶ 76; *see also* Dkt. No. 46-38).  Plaintiff testified that she believed the Infection Control Policy was not enforced consistently.  (Dkt. No. 46-3, pp. 97–98).

### J.  Response Team Policy

In order to handle emergencies at the UHS Vestal Building, the Walk-in staff is designated as part of the Response Team.  (Dkt. No. 46-55, ¶ 89).  The Response Team Policy states that: "In the event that a patient at the Vestal physician practice location needs medical assistance, assistance will be provided within the scope of training of the responding staff and/or providers."  (Dkt. No. 46-25).  The Response Team members are listed as: "Walk In MD, PA or NP; Radiologist; Walk-In clinical staff; Vestal Security."  (*Id.*).  The Policy states the following:

1.  If an individual's condition changes or deteriorates while at UHS Vestal, the staff will activate the Response Team.
2.  Staff will page "Response Team" and location.
3.  The Emergency Medical System will be activated if the patient requires care beyond the scope and capacity of available clinical members and/or providers.
4.  Security will respond to the location.  If the EMS system has been activated, security will direct the EMS personnel to the appropriate location.
5.  The Vestal Radiologist (Monday-Friday-8-430pm, excluding holidays) and/or Walk In provider/RN/LPN will respond and provide stabilizing treatment until resolution of symptoms as determined by a provider or until arrival of EMS.
6.  Individuals responding will be responsible for providing only the level of care and clinical services for which they are licensed, trained and competent.

(*Id.*).  Plaintiff testified that she was aware of the Response Team Policy and had training on it. (Dkt. No. 46-3, pp. 100–01).  The code for the Response Team is always the same—the words "response team" followed by the location; there is no indication when a call goes out as to the nature of the incident.  (Dkt. No. 46-55, ¶¶ 94–95).

### K.  Lead Nurse Outline

According to a document entitled "UHS Medical Group 'Lead Nurse' Outline," the lead nurse has direct responsibilities including but not limited to the following:

1.  General oversight of the Clinical area
2.  Response to Reception Area when needed for chest pain assessments, etc.
3.  Point/Lead person for providers when urgent need arises

     4.   Hourly rounding on patients in rooms, clinical staff (side A and B) and providers

     5.   Building First Call Response

     6.   Communication of completion and accuracy of daily logs and checklists to the Unit Coordinator

(Dkt. No. 83-3, p. 3). Lange stated in an email that the Lead Nurse Outline "was just a guide as to what the lead responsibilities are, that the RN's must continually reassess the clinical flow to include exam room utilization, verbal communication with the clinical team, anticipating the needs of the provider/patients, delegating, providing direction and support to the clinical team." (*Id.*, p. 2). Plaintiff testified that Janice Hover was the "team lead" on August 27, 2015. (Dkt. No. 46-3, p. 103). Westgate testified that "the lead is really a daily designation for who's, basically, been named as the lead RN for that day." (Dkt. No. 83-2, pp. 31–32). Westgate further testified that the lead nurse is not the only one responsible for responding to an emergency code but rather other nurses "all have that responsibility to respond." (*Id.*, p. 32).

## L. Plaintiff's Termination

On August 27, 2015, there was a Response Team call to the lab while Plaintiff was working. (Dkt. No. 46-55, ¶ 96). Plaintiff heard the page, but she did not respond. (*Id.*, ¶ 97). Deborah Begley, the unit receptionist, sent an email to Lange describing the event as follows:

> Vestal first response was called to the lab, I observed Dr. Consolazio responding and no nurses following, I waited a few seconds and when no one else went over I walked out back to the A side which was empty and proceeded over to the B side. I asked Alecia if she or anyone was going to respond with Dr. C. to the call and she said where is Janice (Hover) she isn't rooming a patient, I then proceeded to the break room where Janice was having lunch and told her no one had responded to the first response call with Dr. C. and she got up and responded, Terri B(utler) responded with her as she was just coming out from rooming a patient.

(Dkt. No. 46-42, p. 2). Janice Hover, who had responded to the code when told by Begley that no nurse had gone, also sent an email about the incident, which states in relevant part:

> Alesia was the only RN to hear response on B, and stated that she thought A side would take care of it.  Deb also reported that when she found Alesia and told her that A side had not responded to emergency, Alesia sat in her chair and said, "where's Janice?"  She never responded to emergency in any way.  We were fortunate that this was a dizzy spell in the lab, because if this had been a CPR, Dr. Consolazio would have been alone without the crash cart or O2 to assist this patient.

(*Id.*).

According to Plaintiff, Begley came to her after nobody responded to the code and said "Dr. Consolazio is over there by himself, none of the nurses went."  (Dkt. No. 46-3, pp. 103–04).  Plaintiff testified that: "There were three registered nurses on side A. Janice Hover was the team lead. Janice went to lunch. The other two nurses went -- were in patient rooms. And when you're in patient rooms, you cannot hear that  response code."  (*Id.*, p. 103).  Plaintiff further testified that "[t]here was no communication that Janice had left for lunch. I made the assumption that she went."  (*Id.*).  Plaintiff testified that she did not respond to the lab, but "went over to see where everyone was," and was told that the patient had already been treated and "was fine."  (*Id.*, pp. 103–04).  Plaintiff testified that under the Response Team Policy, every nurse is responsible for response team calls, "but the way we were structured that was part of the side A responsibility, particularly the team lead," while Plaintiff was working on the B side.  (*Id.*, p. 101).

Lange discussed the incident with Talbut and Westgate; Talbut felt that unless Plaintiff had an explanation, the behavior was unacceptable, and recommended a final written warning, and Westgate asked Lange to investigate further.  (Dkt. No. 46-55, ¶¶ 108–10).  Lange obtained statements from other employees and additional emails, but she did not speak to Plaintiff, who was off work on those days.  (*Id.*, ¶¶ 111–12).  Westgate, Lange and, Talbut agreed that the failure to respond to a code could be grounds for termination as a patient could have been

injured or died.  (*Id.*, ¶ 113).  Westgate, Lange and Talbut also agreed they needed to meet with

Plaintiff to get her side of the story and decide what to do.  (*Id.*, ¶ 114).

On September 2, 2015, Plaintiff met with Lange, Talbut and Westgate in Lange's office.

(Dkt. No. 46-55, ¶ 115).  Westgate described the meeting as follows:

> We explained to Ms. Hurban the reason that we were meeting.  We explained that
> it had been brought to our attention that there were allegations or concerns raised
> up about the fact that she had not responded to a code on August 27th and what
> we had learned in the course of investigating it.
> . . . .
> At some point in that conversation Ms. Hurban said, what, are you getting ready
> to fire me here, and stood up.  And I said, okay, listen, we're trying to get the
> facts here.  I'd like you to sit back down.  We need you to talk to us, talk us
> through it.  We need your side of it.  And she said, so you're firing me?  And at
> that point she exited the office, but, like I said, she had gotten pretty loud, and we
> didn't get a chance to even conclude the meeting.

(Dkt. No. 83-2, pp. 105–06).  According to Lange, Westgate asked Plaintiff to explain what had

happened on August 27, 2015, and he had just started the conversation when: "Alesia stood up

and she said, you're firing me, aren't you? You're firing me? And we said, Alesia, you know,

have a seat. We haven't gotten very far yet. Just help us to understand what has happened. And

we didn't get much further in the conversation, and Alesia left the room."  (Dkt. No. 46-35, pp.

26–27).  Westgate testified that he did most of the talking at the meeting, but Lange also spoke,

though he could not remember what she said.  (Dkt. No. 83-2, pp. 129–30).

Plaintiff, on the other hand, testified as follows:

> She (Lange) said there was an issue that they wanted to -- there was something
> they wanted to discuss with me and they said that it was the lab call on August
> 27th.  The fact that I did not respond put them in direct liability, and they got a
> complaint and they investigated it.  And I stated to them, you never talked to me
> about it, so how could you have investigated it fully without ever asking me about
> what happened?  And they said that -- and I said, were you aware that the
> providers were bickering about who was going to go over there?  Kathleen said,
> no.  She took a note down.  She said again, you not responding to that call means
> you were not doing your professional duty.  And I said, did you bring me up here
> to fire me?  And she said, yes.  And I said, then, this conversation is over.  And I

> got up and walked out of the room where they had security guards waiting that took me downstairs to get my purse and sign off the computer, instructed me to leave the building.

(Dkt. No. 46-3, p. 106).

Plaintiff believes that she was terminated because she used the word "discrimination" in the September 1, 2015 email to Westgate. (Dkt. No. 46-55, ¶ 124). According to Lange, Talbut, and Westgate, Plaintiff was terminated because she failed to respond to the emergency code "even after being advised that no nurse had responded, coupled with her completely unprofessional behavior at the meeting on September 2, 2015." (Dkt. No. 46-34, ¶ 24; Dkt. No. 46-45, ¶ 17; Dkt. No. 46-48, ¶ 36).

Shortly after the meeting, Plaintiff sent an email to Lange, Talbut, and Westgate wherein she stated: "I do have one question in the area of employee termination for negligence. I agree I should not have assumed one of the 3 nurses on A side went. But as I stated this was not done with intentional malice or intentionally not trying to perform as expected. Every time I've worked and one was called I was on A side and often was the first responding." (Dkt. No. 46-27, p. 4). She also alleged that another nurse, Hover, was treated more favorably when she was not terminated after failing to triage a pregnant patient. (*Id.*). Westgate responded to the email on September 3, 2015, writing as follows:

> Alesia, I have to take exception with your statement in your email below. As Kathleen and I were describing the concerns to you, you spoke up and said "so you are firing me." When I tried to clarify and present you with your options, you got up and left the office. We never had the opportunity to explain what your options are. They are as follows:
>
> Option 1: In lieu of giving us your immediate, written resignation, UHSH will agree to payout all accrued, unused PTO and Family Leave Bank hours (at 75%; which is by policy).
>
> Option 2: If you choose not to resign, UHSH will move ahead with your immediate termination, and all accrued, unused is forfeited

14

> At this point, I will await your response as to which option you would like to choose.

(*Id.*, p. 2).

Another employee, Pamela Angevine, also failed to respond to the emergency code on August 27, 2015, but she was not terminated or disciplined. (Dkt. No. 83-2, pp. 112–13). Angevine was a Medical Office Assistant ("MOA"). (*Id.*). Talbut testified that "Ms. Angevine was not required to respond as part of the policy." (Dkt. No. 46-46, p. 29). Talbut also testified that, if she had responded, Angevine could have helped to bring equipment and take vital signs. (*Id.*, p. 32). In her affidavit, Talbut states that "[f]rom a clinical perspective, a medical assistant is not an essential member of the response team because of their limited scope of practice. Pam Angevine did not violate the Response Team policy by not responding to the code." (Dkt. No. 74-2, ¶ 3). According to Lange, she "determined that coaching was appropriate to make sure that Ms. Angevine knew she needed to respond when a code was called even if she was on Side B, but that as Ms. Angevine was an MOA and not an RN, she did not violate any policy and discipline was not appropriate." (Dkt. No. 74-1, ¶ 5). Westgate testified that Angevine was not required to respond and that "[i]t's the RN that we required, to respond and the doctors and the nurse practitioners or physician assistants." (Dkt. No. 83-2, p. 118).

Defendant also investigated Plaintiff's allegation that Hover failed to triage a patient, and the medical records showed the patient was properly triaged, seen by the provider, and timely transferred to the emergency room. (Dkt. No. 46-55, ¶¶ 131–34). Talbut found the care given to the patient in question was appropriate. (*Id.*, ¶ 135).

15

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still,

the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

On summary judgment, Plaintiff attempts to sustain the following federal claims under the ADA: 1) intentional discrimination based on disparate treatment due to her disability; 2) discrimination due to disparate impact of a policy on disabled persons; 3) discrimination due to failure to make a reasonable accommodation for her disability; and 4) retaliation for various complaints she made. (*See* Dkt. Nos. 68, 69, 83); *see also Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) ("A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'") (quoting *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 573 (2d Cir. 2003)). Plaintiff also attempts to sustain related claims under New York State law. The Court will consider each claim in turn.

### A.  ADA Claims

#### 1)  Intentional Discrimination Claim

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009).  "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Id.* (citation omitted).  "When evaluating pretext, a court must consider the plaintiff's evidence as a whole."  *Dotson v. City of Syracuse*, 688 F. App'x 69, 72 (2d Cir. 2017).

Plaintiff's intentional discrimination claim rests on the theory that, after she returned from medical leave for breast cancer surgery, "Defendant discriminated against Plaintiff on the basis of her disability by assigning her to work every holiday."  (Dkt. No. 68, p. 7).  To establish a prima facie case for this claim, Plaintiff must show that: 1) Defendant is subject to the ADA; 2) she was disabled within the meaning of the ADA; 3) she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; and 4) she suffered an adverse employment action because of her disability.  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (citation omitted).  Here, the parties only dispute the fourth requirement.

Defendant argues that Plaintiff did not suffer an adverse action because the 2015 Holiday email was not a final work schedule.  (Dkt. No. 46-56, pp. 19–20).  In response, Plaintiff asserts that "[b]y preventing Plaintiff from taking vacation days, Defendant subjected

Plaintiff to a material loss of benefits." (Dkt. No. 68, p. 9). In general, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000)). An adverse employment action is "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (citation omitted).

In this case, it is undisputed that the 2015 Holiday email was not a final schedule, and that Plaintiff had the opportunity to change shifts to avoid working the day she wanted off. (Dkt. No. 46-18, pp. 2–4; Dkt. No. 46-19, p. 2). Moreover, Plaintiff did not actually work on any of the days in the 2015 Holiday email because her employment was terminated before the holiday season began. (Dkt. No. 46-55, ¶ 69). Therefore, Plaintiff has not adduced evidence to show that she suffered a materially adverse change in the conditions of her employment. *See also Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011) ("In general, the denial of vacation time does not generally rise to the level of an adverse employment action."), *aff'd*, 513 F. App'x 34 (2d Cir. 2013).

Further, even assuming the 2015 Holiday email constituted an adverse action, Plaintiff has not adduced evidence to show that "the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). A plaintiff can establish an inference of discrimination in various ways, through direct or indirect evidence. "The circumstances that give rise to an inference of discriminatory

motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). In addition, "[a] showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotations and citation omitted).

As to direct evidence, Plaintiff states that she was told that her cancer "didn't matter" when it came to the 2015 Holiday schedule and that her supervisors ignored her requests to change the schedule on that basis. (Dkt. No. 68, pp. 9–10). But this evidence shows that Plaintiff was treated the same as non-disabled employees. Indeed, Plaintiff's complaint at the time was that she should have received special treatment due to her breast cancer treatment. (*See* Dkt. No. 46-16, p. 2; Dkt. No. 46-21, pp. 2–3). As to indirect evidence, the record shows that some non-disabled employees were also scheduled to work for the same amount of time as Plaintiff during the 2015 holiday season. (Dkt. No. 46-18, pp. 2–4). Accordingly, Plaintiff has failed to establish a prima facie case for intentional discrimination based on disparate treatment, and her claim must be dismissed.[3] *See also Batchelor v. City of New York*, 12 F. Supp. 3d 458, 470 (E.D.N.Y. 2014) ("Furthermore, even if Plaintiff had sufficiently shown an adverse employment action as to the distribution of vacation, holiday or weekly 'pass days,' the claim nevertheless fails because Plaintiff failed to raise any inference of discrimination as to any hypothetical adverse action.").

---

[3] Furthermore, even if Plaintiff were able to make out a prima facie case of intentional discrimination, Defendant has articulated a legitimate, non-discriminatory reason for sending the 2015 Holiday email – to allow nurses to make plans and trade shifts for the holiday season, (*see* Dkt. No. 46-30, ¶ 5), and Plaintiff has pointed to no evidence that this reason was a pretext for intentional discrimination.

### 2) Disparate Impact Claim

Plaintiff argues that even if the 2015 Holiday schedule "is not deemed disparate treatment, it is clearly evidence of disparate impact in that a rigid formula (which appears facially neutral) has a discriminatory impact on protected classes (such as individuals suffering from a disability that would prevent them from working)." (Dkt. No. 68, p. 8). In response, Defendant argues that Plaintiff's claim must fail because: 1) she did not plead a disparate impact claim; and 2) there is no evidence to support such a claim. (Dkt. No. 74, pp. 7–8).

As to the first argument, it is well-settled that a claim must be set forth in the pleadings, in order to give the defendant fair notice. *See* Fed. R .Civ. P. 8(a). Plaintiff's complaint makes no mention of a disparate impact theory of liability. (Dkt. No. 1). Rather, she alleges disparate treatment, which is a distinct theory. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) ("This Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact."). Thus, Plaintiff's claim may not be raised for the first time in opposition to summary judgment. *See Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.").

Moreover, even were the Court to consider Plaintiff's new disparate impact claim, she has failed to adduce sufficient evidence to survive summary judgment. Disparate impact claims are analyzed using "a modified version of the burden-shifting analysis usually applied to employment discrimination cases." *Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 205–06 (2d Cir. 2010). "In order to establish a prima facie case of disparate impact, the plaintiff must provide evidence showing (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular

21

type produced by the defendant's facially neutral acts or practices." *Id.* (internal quotation and citation omitted). "Although the plaintiff need not show discriminatory intent under this theory, it must prove that the practice actually or predictably results in . . . discrimination." *Id.* (internal quotation and citation omitted). "Thus, 'plaintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups.'" *B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Tsombanidis*, 352 F.3d at 575). "This can be done by offering evidence showing that a neutral policy adversely affects a much greater percentage of people with a disability than it affects people without a disability." *Id.*

Here, Plaintiff has identified an outwardly neutral practice – Defendant's policy of scheduling staff to work on holidays based on the holidays they worked the previous year. Plaintiff appears to suggest that this policy has a disparate impact on disabled persons by forcing them to work on holidays even when it was their disability that prevented them from working the previous year, as opposed to other reasons. However, Plaintiff has not adduced any evidence to show this disparate impact. For example, there is no statistical evidence that disabled persons were required to work more holidays than non-disabled persons. Accordingly, Plaintiff has failed to establish a prima facie case of disparate impact, and her claim must be dismissed. *See Ricci v. DeStefano*, 557 U.S. 557, 587 (2009) (noting that a prima facie case of disparate impact liability requires a "threshold showing of a significant statistical disparity"); *see also Stratton v. Ernst & Young, LLP*, No. 15 Civ. 1047, 2016 WL 6310772, at *7, 2016 U.S. Dist. LEXIS 149140, at *19–20 (S.D.N.Y. Oct. 27, 2016) ("If Plaintiff really wanted to pursue this theory of liability, it was his burden to adduce evidence to create a genuine question of fact regarding disparate impact. Because the statistics he has presented are inadequate to do so, his disparate impact claim also fails.").

### 3)  Failure to Accommodate Claim

Plaintiff's failure to accommodate claim is based on her allegation that, in 2013, when she asked for permission to schedule a breast cancer biopsy during her shift, her supervisor failed to accommodate her disability by asking her to reschedule the biopsy.  (*See* Dkt. No. 46-3, p. 16).  Defendant argues that Plaintiff's claim fails for three reasons: 1) it is barred by the statute of limitations; 2) it is barred by the failure to include it in her complaint to the Equal Employment Opportunity Commission ("EEOC"); and 3) Defendant did not fail to accommodate Plaintiff.  (Dkt. No. 46-56, pp. 22–23).  Plaintiff has only responded to Defendant's second argument.  (Dkt. No. 68, p. 16).

Defendant's first argument is dispositive.  Plaintiff had 300 days from the time of the alleged unlawful employment practice to file a charge with the EEOC.  *See* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a).  "The Second Circuit has interpreted this EEOC filing requirement as a statute of limitations barring all claims arising from discrete acts which occurred outside of the 300-day period."  *Wisneski v. Nassau Health Care Corp.*, 296 F. Supp. 2d 367, 375 (E.D.N.Y. 2003); *see also Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir. 1999); *Dollinger v. State Ins. Fund*, 44 F. Supp. 2d 467, 477 (N.D.N.Y. 1999) ("Any claim under the ADA must be brought within 300 days of the alleged discriminatory act(s) otherwise it is time-barred and may not be the basis for relief in federal district court.").

In this case, the alleged failure to accommodate occurred in the fall of 2013, but Plaintiff did not submit a charge to the EEOC until on or around October 13, 2015, approximately two years later.  (Dkt. No. 1, ¶ 4).  Therefore, since more than 300 days passed between the alleged unlawful employment practice and the EEOC charge, Plaintiff's failure to

accommodate claim is time-barred and must be dismissed.[4]  *See Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999) ("Because Harris did not file his first EEOC charge until August 31, 1994, which was more than 300 days after he should have known he was passed over for promotion to sergeant, his ADA claim based on that injury is time-barred."); *Usala v. Consol. Edison Co. of N.Y.*, 141 F. Supp. 2d 373, 379 (S.D.N.Y. 2001) (finding ADA claims time-barred based on date of EEOC charge).

### 4)  Retaliation Claim

Retaliation claims under the ADA "are subject to the same burden-shifting analysis as claims arising under Title VII." *Smith v. N.Y.C. Dep't of Educ.*, 808 F. Supp. 2d 569, 581 (S.D.N.Y. 2011) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  In the first stage, Plaintiff must establish a prima facie case of retaliation, which requires her to show that: 1) she engaged in an protected activity; 2) the employer was aware of this activity; 3) the employer took adverse employment action against her; and 4) a causal connection exists between the alleged adverse action and the protected activity.  *Treglia*, 313 F.3d at 719.  "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Id.* at 721.  "If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id.* (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).[5]

---

[4] Since Plaintiff's claim is time-barred, the Court need not address Defendant's remaining arguments.

[5] In order to establish a claim for retaliation under Title VII, a plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2533 (2013).  The Second Circuit has not decided whether this "but-for causation" standard applies to a claim of retaliation

Plaintiff's retaliation claim rests on several theories and series of events. First, she alleges that Defendant scheduled her to work all of the holidays in 2015 in retaliation for Plaintiff taking medical leave in 2014. (Dkt. No. 1, ¶¶ 51–54). Second, she alleges that Defendant disciplined her for violating the Infection Control Policy in retaliation for Plaintiff complaining about the holiday scheduling practice. (*Id.*, ¶¶ 60–64). Third, she alleges that Defendant placed a hold on her Clinical Ladders application after she complained about issues with staffing and patient safety. (*Id.*, ¶¶ 24–40). Fourth, she alleges that Defendant terminated her employment after she complained about discrimination. (*Id.*, ¶¶ 82–94). The Court will consider each theory of retaliation in turn.

### a. 2015 Holiday Schedule

Plaintiff asserts that she engaged in protected activity by taking medical leave in 2014 and then suffered an adverse action when she was scheduled to work all of the holidays in 2015. (Dkt. No. 68, p. 11). Assuming *arguendo* that Plaintiff has established a prima facie case of retaliation based on this series of events, Defendant has articulated and evidenced a legitimate, non-discriminatory reason for sending the 2015 Holiday email: to allow nurses to make plans and trade shifts for the holiday season, as discussed above.

Defendant having met its burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a

---

under the ADA, or whether the less burdensome "motivating factor" standard applies. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 n.3 (2d Cir. 2014) (summary order) (declining to resolve whether the "but-for" standard applies to an ADA retaliation claim). The Circuit has also approved but-for causation in a case involving discrimination and retaliation claims under the Age Discrimination in Employment Act. *See Varno v. Canfield*, 664 F. App'x 63, 66 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 88 (2017) ("In order to succeed on a retaliation claim after a defendant has established a legitimate, non-discriminatory reason for the adverse action, the plaintiff must present evidence that retaliation was the 'but-for' cause of the action."). Ultimately, this issue is not dispositive since Plaintiff has failed to submit sufficient evidence to establish a genuine issue of material fact as to causation under either standard.

pretext for impermissible retaliation." *Treglia*, 313 F.3d at 721 (quoting *Cifra*, 252 F.3d at 216). The Second Circuit has noted that in a Title VII retaliation case, where a plaintiff must prove that retaliation was a but-for cause of an adverse employment action, the plaintiff may do so "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination").

Here, Plaintiff points to no such evidence. Rather, the record shows that other Walk-in staff were also scheduled to work the 2015 holidays, even if they did not take medical leave. (Dkt. No. 46-18, pp. 2–4). Further, it is undisputed that the 2015 Holiday email was based on the days that staff worked or did not work the previous year, regardless of the reason they missed work. Based on these facts, no reasonable jury could conclude that Defendant's proffered reason for the 2015 Holiday email was a pretext for impermissible retaliation. Therefore, Plaintiff cannot sustain a retaliation claim based on this theory of liability.

**b. Infection Control Policy**

Next, Plaintiff argues that she was disciplined for violating the Infection Control Policy, on August 11, 2015, in retaliation for earlier complaining about the 2015 Holiday email. (Dkt. No. 68, p. 13). The record shows that Plaintiff emailed Clark on July 30, 2015 to ask if there "was any consideration for the fact that I was out for cancer surgery and that's why I didn't work." (Dkt. No. 46-18, p. 2). On August 11, 2015, Plaintiff emailed Westgate to further complain about the holiday scheduling policy. (Dkt. No. 46-21, pp. 2–3). According to

Plaintiff, "Defendant waited to provide Plaintiff with the constructive disciplinary action during a meeting which Plaintiff was summoned to discuss her complaint regarding scheduling," and "Defendant did this to send a clear message to Plaintiff that any complaints would be met with swift punishment."  (Dkt. No. 68, p. 13).

Assuming *arguendo* that Plaintiff has established a prima facie case of retaliation based on this series of events, Defendant has articulated and evidenced a legitimate, non-retaliatory reason for the constructive discipline: Plaintiff's failure to follow the Infection Control Policy. (Dkt. No. 46-56, p. 21).  It is undisputed that Plaintiff violated the Policy by eating a bagel while working at the Walk-in.  (Dkt. No. 46-55, ¶¶ 70–73).  Plaintiff argues that this reason was pretextual because "enforcement of the policy was discretionary."  (Dkt. No. 68, p. 13).  But Plaintiff points to no evidence of selective enforcement, besides her own conclusory testimony. (Dkt. No. 46-3, pp. 97–98).  The record shows that other employees received constructive discipline for violating the Infection Control Policy, for example drinking coffee at the nurse's station, regardless of whether they had complained about scheduling.  (*See* Dkt. No. 46-38). Based on these facts, no reasonable jury could conclude that Defendant's proffered reason for the constructive discipline was a pretext for impermissible retaliation.  Therefore, Plaintiff cannot sustain a retaliation claim based on this theory of liability either.

### c.  Clinical Ladders Application

Plaintiff argues that "Defendant subjected her to an adverse employment action by placing a hold on her Clinical Ladders application," the hold "coming mere days after Plaintiff made complaints about patient safety."  (Dkt. No. 68, p. 17).  In response, Defendant contends that "[t]he only evidence in the record is that Talbut made the decision to place a hold on Plaintiff's Clinical Ladders application because Plaintiff needed to learn to communicate

27

respectfully with her managers." (Dkt. No. 74, p. 10). Although the parties appear to assume that Plaintiff has made out a prima facie case for retaliation, there is no evidence that her complaints about patient safety and/or staffing amounted to protected activity. The ADA's retaliation provision states: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The record shows that Plaintiff complained about patient safety and staffing concerns at the June 21, 2014 meeting, and Plaintiff specifically testified that she did not make any complaints about discrimination or a failure to accommodate. (Dkt. 46-3, pp. 53–54). Therefore, Plaintiff has not shown that she engaged in protected activity in order to establish a prima facie case, and her retaliation claim based on the Clinical Ladders application must be dismissed.[6]

### d. Termination

The gravamen of Plaintiff's retaliation claim is the allegation that Defendant terminated Plaintiff's employment because she complained about discrimination. (Dkt. No. 68, pp. 14–15). The record shows that Plaintiff was terminated on September 2, 2015 in a meeting with Lange, Talbut and Westgate, or very shortly thereafter. (Dkt. No. 46-55, ¶ 115; Dkt. No. 46-3, p. 91; Dkt. No. 46-27, p. 2). The previous day, September 1, 2015, Plaintiff sent an email to Westgate complaining about the 2015 Holiday email, writing in relevant part that: "[s]cheduling me for

---

[6] Moreover, even if Plaintiff had established a prima facie case, Defendant has articulated a legitimate, non-retaliatory reason for placing a hold on Plaintiff's Clinical Ladders application, and Plaintiff has pointed to no evidence of pretext. Although Plaintiff suggests that the temporal proximity between the June 21, 2014 meeting and the hold on her application evidences retaliatory intent, (Dkt. No. 68, p. 17), "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013); *see also Pierre v. Napolitano*, 958 F. Supp. 2d 461, 482 (S.D.N.Y. 2013) ("Although temporal proximity can be sufficient to support an inference of causation at the prima facie stage, it is insufficient to show pretext at the third step.").

every holiday during the Christmas season certainly does not take into consideration my individuals needs which per the policy is <u>not condoned</u> and it's starting to make me feel like I'm being discriminated against for having breast cancer and having needed surgery (which in my case was life saving!)." (Dkt. No. 46-22, p. 2). According to Westgate, he did not see the email before the September 2, 2015 meeting, he did not share it with Lange or Talbut, and it played no part in Plaintiff's termination. (Dkt. No. 46-48, ¶¶ 27–28; *see also* Dkt. No. 83-2, pp. 89–91). Based on these facts, Defendant argues that Plaintiff cannot make out a prima facie case of retaliation because Westgate, Lange, and Talbut were unaware of Plaintiff's complaint about discrimination at the time of the September 2, 2015 meeting. (Dkt. No. 46-56, p. 24).

In response, Plaintiff contends that "Lange, Talbut, and Westgate were all aware of the fact that Plaintiff engaged in protected activity on numerous occasions." (Dkt. No. 83, p. 3). Besides the September 1, 2015 email, the record contains several earlier emails where Plaintiff complained about the proposed 2015 Holiday schedule. First, on July 30, 2015, Plaintiff emailed Clark to ask if there was "any consideration for the fact that I was out for cancer surgery and that's why I didn't work?" (Dkt. No. 46-18, p. 2). Second, on August 11, 2015, Plaintiff emailed Westgate to complain that Defendant's policy for scheduling staff on the holidays did not take "any consideration for the fact that I was out for a catastrophic illness." (Dkt. No. 46-21, p. 3). Third, on August 30, 2015, Plaintiff emailed Westgate again, writing that: "I did not hear back from you regarding the issue of making someone work every holiday if they were out the year before due to catastrophic illness (cancer surgery). Also, can you please send any policies that address this issue?" (Dkt. No. 46-22, p. 3). Based on these emails,

a reasonable jury could find that Plaintiff engaged in protected activity by complaining about discrimination, and that Westgate was aware of it before the September 2, 2015 meeting.[7]

Assuming Plaintiff has established a prima facie case, Defendant points to two well-supported reasons for Plaintiff's termination: "failing to respond to a patient code and her behavior in the meeting with her supervisors to address that issue."  (Dkt. No. 46-56, p. 24). Defendant having met its burden to show legitimate, non-retaliatory reasons for its decision, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia*, 313 F.3d at 721 (quoting *Cifra*, 252 F.3d at 216).

Here, Plaintiff asserts that "both of Defendant's proffered reasons are false and merely pretextual for the following reasons: 1) another employee of Defendant, Pam Angevine, was a member of the 'Response Team' and failed to respond to the same emergency code; and 2) there are genuine issues of material fact and serious discrepancies surrounding the meeting in which Plaintiff was terminated."  (Dkt. No. 68, pp. 14–15).[8]

First, it is undisputed that Plaintiff failed to respond to the emergency code on August 27, 2015.  (Dkt. No. 46-3, pp. 111–12).  Indeed, Plaintiff admitted afterward in an email that: "I agree I should not have assumed one of the 3 nurses on A side went. But as I stated this was not done with intentional malice or intentionally not trying to perform as expected."  (Dkt. No. 46-

---

[7] Arguably, Plaintiff's failure to respond to the emergency code on August 27, 2015 severed any inference of causation between her earlier complaints and the termination of her employment.  *See Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.").  Nonetheless, the Court will assume that Plaintiff has established a prima facie case and proceed to the next step of the analysis.

[8] In the Complaint, Plaintiff also alleged that another nurse, Janice Hover, was treated more favorably in that she was not terminated after failing to properly treat a patient.  (Dkt. No. 1, ¶¶ 88–92).  However, it is undisputed that she did not fail to properly treat the patient in question.  (Dkt. No. 46-55, ¶¶ 131–35).

27, p. 4).  It is also undisputed that Angevine, a Medical Office Assistant at the Walk-In, also failed to respond to the same code, but unlike Plaintiff, she was not terminated or disciplined. (Dkt. No. 83-2, pp. 112–13).  Plaintiff contends that there is an issue of fact as to whether or not Angevine was required to respond, and thus whether she should have also been disciplined. (Dkt. No. 83, p. 2).  According to the Response Team Policy, the Walk-In clinical staff are members of the Response Team, (Dkt. No. 46-25), and there is no dispute that both nurses and MOA's are part of the Walk-In clinical staff.  But importantly, the Response Team Policy provides additional duties for nurses like Plaintiff.  The Policy states that "the staff" will activate the Response Team, the staff will page "Response Team" and location, and then the Radiologist and/or Walk-In provider, *RN*, LPN "will respond and provide stabilizing treatment until resolution of symptoms as determined by a provider or until arrival of EMS."  (*Id.*) (emphasis added).  There is no requirement in the Policy for a MOA to respond to an emergency code.

Plaintiff focuses on testimony from Westgate and Talbut which states that Angevine could have responded and provided assistance, such as bringing a medical bag and making the patient comfortable.  (Dkt. No. 83, pp. 7–8).  However, just because Angevine could have responded to the code does not mean that she was required to and that she should have been disciplined for not doing so.  Any factual dispute as to what Angevine *could have done* is beside the point.  Since, unlike Plaintiff, Angevine did not violate the Policy, the fact that she was not disciplined fails to support a showing of pretext.[9]

---

[9] Put another way, Angevine was not "similarly situated" as Plaintiff, and therefore, any difference in discipline between them would not evidence causation or pretext.  *See Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("In the context of employee discipline, however, the plaintiff and the similarly situated employee must have 'engaged in comparable conduct,' that is, conduct of 'comparable seriousness.'") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39-40 (2d Cir. 2000)).

Plaintiff also suggests that "it is primarily the responsibility of the 'Lead Nurse' to respond to an emergency code." (Dkt. No. 83, p. 9). The record shows that Janice Hover was the lead nurse on August 27, 2015, and that she ultimately responded to the emergency code. (Dkt. No. 46-3, p. 103; Dkt. No. 46-42, p. 2; Dkt. No. 46-55, ¶¶ 103–06). According to the Lead Nurse Outline, her duties included "Point/Lead person for providers when urgent need arises" and "Building First Call Response." (Dkt. No. 83-3, p. 3). However, even if Hover had "primary responsibility" for responding to the emergency code, the undisputed facts show that Plaintiff also had to respond but failed to do so. By her own admission, she "made the assumption" that Hover had responded and taken care of the situation. (Dkt. No. 46-3, p. 103). Therefore, the fact that Hover may have had "primary responsibility" for responding to the emergency code does not excuse Plaintiff's failure or suggest that this reason for terminating her employment was pretextual.

Second, Plaintiff attempts to show pretext by pointing to inconsistencies in the record as to who said what at the September 2, 2015 meeting. (Dkt. No. 68, p. 16). Plaintiff testified that Lange started the meeting and explained that Plaintiff's failure to respond to the emergency code on August 27, 2015 "put them in direct liability" and "means you were not doing your professional duty." (Dkt. No. 46-3, p. 106). According to Plaintiff, she then asked if she was being terminated, Lange answered yes, and then Plaintiff said the conversation was over and left the room. (*Id.*). According to Westgate, he did most of the talking at the meeting, and he asked Plaintiff to explain why she failed to respond to the code on August 27, 2015, and then Plaintiff asked if she was being fired and left the room. (Dkt. No. 83-2, pp. 105–06). Lange described the meeting virtually the same way. (Dkt. No. 46-35, pp. 26–27). There is evidence that both Lange and Westgate spoke at the meeting. (Dkt. No. 46-27, p. 2; Dkt. No. 83-2, p. 105).

Westgate's email from after the meeting indicates that Plaintiff was not terminated until later. (Dkt. No. 46-27, p. 2). Based on this record, Plaintiff suggests that there is a factual dispute as to whether she was really told at the September 2, 2015 meeting that she was being terminated, and by whom. (Dkt. No. 83, pp. 9–11).

However, the facts emphasized by Plaintiff's are not material to her retaliation claim. On summary judgment, at the third stage, she must adduce evidence that Defendant's proffered reasons for terminating her employment were pretextual. Those reasons were Plaintiff's failure to respond to the emergency code on August 27, 2015 and her unprofessional behavior at the September 2, 2015 meeting. There is no evidence that the first reason was pretextual, as discussed above. As to the second reason, is it undisputed that Plaintiff was called into the September 2, 2015 meeting to discuss her failure to respond to the emergency code, and further, that she left the meeting before it was over and without offering any explanation for her failure to respond. (Dkt. No. 46-3, p. 106; Dkt. No. 46-35, pp. 26–27; Dkt. No. 83-2, pp. 105–06). Based on these facts, a reasonable jury would have to conclude that Plaintiff acted unprofessionally at the meeting. Whether Plaintiff was told at the meeting that she was being fired, and by whom, are not facts which would lead to a different result.[10] In other words, there is no evidence indicating that Plaintiff acted *professionally* at the September 2, 2015 meeting. Therefore, Plaintiff has failed to demonstrate any inconsistency, contradiction, or weakness in the second reason given for her termination, so as to suggest that it was pretextual.

In addition, Plaintiff has not adduced competent evidence for a reasonable jury to conclude that the real reason Defendant terminated her employment was retaliation for

---

[10] Moreover, Plaintiff's version of events actually undercuts her retaliation claim because there is no evidence that Lange was aware of Plaintiff's discrimination complaint; she did not receive Plaintiff's emails dated July 30, 2015, August 11, 2015, August 30, 2015, and September 1, 2015. (*See* Dkt. No. 46-18, p. 2; Dkt. No. 46-21, p. 3; Dkt. No. 46-22, pp. 2–3).

complaining about discrimination.  Plaintiff testified that she believed she was terminated because the previous day she used the word "discrimination" in her email to Westgate.  (Dkt. No. 46-3, p. 111).  Aside from this speculation, Plaintiff relies on evidence of temporal proximity: even if Westgate did not see the "discrimination" email before the September 2, 2015 meeting, Plaintiff's termination closely followed several other emails where she made similar complaints, as discussed above.  However, evidence of temporal proximity on its own is insufficient to show pretext.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").  Therefore, Plaintiff has failed to show that her complaints about discrimination in any way motivated the decision to terminate her employment.

In sum, Plaintiff has failed to adduce evidence from which a reasonable jury could conclude that Defendant's explanation was merely a pretext for impermissible retaliation. Altogether, viewed in the light most favorable to Plaintiff, the evidence does not permit a rational finding that Defendant's stated reasons for terminating Plaintiff's employment were false or that retaliation played any part in the decision.  Accordingly, since Plaintiff has failed to support a retaliation claim under any of the above theories, her claim must be dismissed.  *See Widomski v. State U. of New York (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014) ("Contarino's good faith belief that Widomski fabricated two assignments constitutes a legitimate, nonretaliatory reason for bringing a disciplinary action against him.  The burden having shifted back to Widomski to provide competent evidence of pretext, Widomski fails to raise a genuine factual dispute as to whether this explanation is false or otherwise pretextual.");

*Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 624 (2d Cir. 2012) ("On this record, no reasonable jury could find that Thomsen has demonstrated that the reasons proffered by Stantec for his firing were pretexts and that the real reason the company let him go was retaliation for his taking FMLA leave."); *Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 437 (E.D.N.Y. 2012) ("[P]laintiff cannot simply substitute utter speculation for the competent proof that would be necessary to permit rational inferences by a jury of discrimination or retaliation."); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 251 (N.D.N.Y. 2010) ("In light of Utica Mutual's proffered legitimate, non-retaliatory reasons, the comprehensive investigation, and the lack of additional evidence as discussed below, a reasonably jury could not conclude that defendant's reason for Sharpe's termination was pretextual.").

### B.  State Law Claims

Finally, since none of Plaintiff's federal claims survive summary judgment, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under New York State law. *See* 28 U.S.C. § 1367(c)(3); *Snow v. Village of Chatham*, 84 F. Supp. 2d 322, 329 (N.D.N.Y. 2000).

### V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Date:   February 22, 2018
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

35